No. 22,933.

FRANK G. CLARK, *Appellant*, v. THE TOPEKA FLOUR MILLS COMPANY, *Appellee*.

### SYLLABUS BY THE COURT.

1. SALE OF FLOUR—*Negotiations Through Broker—Minds of Contracting Parties Never Met—No Completed Contract.* The appellant, claiming that he bought from the appellee 5,000 barrels of flour delivered in Chicago and that only 4,000 barrels were shipped, bought 1,000 barrels at an advanced price and sued to recover the difference. *Held,* that the evidence is sufficient to sustain findings to the effect that he had no contract with the appellee because the minds of the parties never met on the terms of a contract by reason of appellant's failure to agree to the terms of a written confirmation sent him.

2. SAME—*No Acceptance of Written Confirmation of Terms of Sale Made Known by Appellant.* A milling company at Topeka sold 5,000 barrels of flour at a certain price to a broker at Kansas City, and under his directions shipped the flour to the appellant at Chicago at an advanced price by which the broker was to receive twelve cents per barrel commission. Appellee sent a written confirmation to the appellant offering to enter into a contract direct with him for the sale of the flour, which he retained, but he never informed appellee whether he agreed to it or not. *Held,* that if he had any contract with the appellee it was upon the terms stated in the written confirmation.

3. SAME—*Diversion of Part of Flour to Third Person—Appellant's Consent Thereto.* Even accepting the view that the parties had a contract for 5,000 barrels of flour, the evidence was sufficient to sustain a finding that the appellant authorized the shipment of a thousand barrels to a third person, and that the diversion of the flour amounted to a delivery under the contract.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed June 11, 1921. Affirmed.

*D. R. Hite,* and *Dennis C. Payne,* both of Topeka, for the appellant.

*Edwin A. Austin,* of Topeka, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The appellant, claiming that he bought from the appellee 5,000 barrels of flour delivered in Chicago and that only 4,000 barrels were shipped, bought in 1,000 barrels at an advanced price and sued to recover the difference. There was a judgment against him for costs, from which he appeals.

The trial court made findings of fact in substance as follows:

Clark, the appellant, is a flour merchant in Chicago,. Ill. E. E. Pierson, a commission merchant and broker in flour at Kansas City, had had many transactions with the Topeka Flour Mills Company, in most of which he had acted as broker, receiving a commission for his services in selling flour. In some instances he had bought outright and had been allowed a certain percentage on a commission basis. August 8, 1916, the appellee sold Pierson 5,000 barrels of Gold Bell flour at $5.60, bulk, f. o. b. Kansas City. On August 14 Pierson wrote Clark confirming a sale made by telegram to him of the same flour to be shipped by the Topeka Flour Mills Company at $6

per barrel, bulk, delivered at Chicago. By letter to Pierson, Clark confirmed the sale. Pierson wrote the appellee:

"In filling the contract I have with you for 5,000 bbls. of Gold Bell . . . please load this flour into twenty cars, 250 bbls. to each car, and invoice the flour to Mr. Frank G. Clark, . . . Chicago, Illinois. Make your arrival draft against the shipments for $5.98 per bbl. delivered to Chicago, stopping the cars at Kansas City for inspection, attaching . . . certificate to your draft with bill of lading."

On August 23 the appellee sent to Clark original and duplicate confirmation sheets of the purchase, saying: "We beg to confirm sale per E. E. Pierson of 8-8-16 upon terms and conditions named below." Under the term "basis" the confirmation contained this statement: "Cars to be stopped at Kansas City for inspection, buyer to pay inspection charges." On the bottom of the sheet marked original there was this statement: "Sign attached duplicate and return promptly." The duplicate was marked: "Sign here . . . and return promptly." Clark did not sign or return or acknowledge in any way the original or duplicate. confirmations; nor did he reply to a letter of August 25 written by the appellee which stated:

"Regarding the booking for 5,000 barrels Gold Bell flour with you, made through Mr. E. E. Pierson of Kansas City, we beg to advise that we have made application for the empty cars."

On September 18 the appellee wrote him: "On August 23d we sent you a confirmation, our No. 275. Please sign the duplicate attached and return in order to complete our files"; to which Clark replied on September 21 by letter: "I have been unable to locate the confirmation which you say you sent August 23d. Will you kindly forward another and will sign and return to you." No other confirmation was sent to him and he had no direct communication with the appellee from that time until October 26, when he wired: "Hurry shipment last thousand Gold Bell." The appellee began to ship the flour to Clark August 25 and continued until 4,000 barrels had been forwarded, the last car on September 22. The flour was billed direct to Clark, the billing giving as the date the flour was sold "8-8-16, directions received 8-23-16, sold by E. E. P. to Frank G. Clark, $5.98 per barrel, basis Chicago, freight to be deducted, stop at Kansas City for inspection." The appellant

paid the drafts which accompanied the invoices and accepted the flour, but made claims against Pierson for one-half the inspection charges at Chicago and also for short weights. The bills for these claims Pierson sent to the appellee. On September 21, the appellee wrote Clark:

"We have been handed a bill from you by Mr. E. E. Pierson for half inspection on 5 cars and a memo. of short weights on the same cars. This flour was sold to Mr. Pierson, f. o. b. Kansas City; Kansas City weights and inspection. Therefore we can not allow your bill for inspection. . . . We will allow 1 lb. [per sack] short weight on these shipments."

Clark, without answering these letters, sent them to Pierson and again offered to credit Pierson with whatever the appellee sent him, but stated that he expected Pierson to stand the difference for the reason that the flour was bought f. o. b. Chicago and subject to Chicago inspection and weights.

The finding with reference to the thousand barrels that were never shipped direct to the appellant is that on September 7, 1916, Pierson had sold a Boston firm a thousand barrels of Gold Bell flour and on the same day wrote Clark as follows: "May I borrow 1,000 bbls. of the Gold Bell to apply on another contract and then ship you the thousand barrels in October?" Clark on the following day replied: "I have your favor of the 7th and note same. It will be all right with me for you to transfer 1,000 barrels of my Topeka Gold Bell contract to October shipment." Pierson requested appellee to hold back a thousand barrels on Clark's order. The appellee wrote him stating that they would like to comply with his request but would be obliged to get out the Clark order at that time, but would hold it back "all we can but cannot promise very much." Accordingly the appellee shipped the thousand barrels on the order of Pierson to Boston. On October 24 Clark wired Pierson: "Why don't Topeka ship thousand Gold Bell transferred to October?" Pierson replied: "I have shipped out all the flour they owe me and cannot get any more from them until next month on account of being over-sold. I will try and get another thousand bbls. from one of my other mills to take the place of this."

To this Clark replied by letter:

"If you will remember some time ago you wrote you had 1,000 barrels Gold Bell for October shipment, and would I take this October shipment

contract and let you have 1,000 barrels of my Gold Bell for prompt shipment. This I agreed to do at that time and am sorry you did not ship. I saw buyer and he will take 1,000 barrels of Gold Bell for November shipment, but must have it in November as he has the flour sold. If you cannot get Gold Bell be sure to get a 95 per cent patent of equal quality so there will be no trouble later on. Don't delay shipment after November."

About the same date Clark wired appellee direct: "Hurry shipment last thousand barrels Gold Bell." The appellee wrote that they had taken the matter up by telephone with Mr. Pierson "to whom we originally sold the flour. We beg to refer you to him for an adjustment of this matter, as we have filled our contract under instructions." To this appellant replied:

"I was very much surprised to receive your letter of the 26th in which you state you have filled all your contracts with Mr. Pierson. I still have 1,000 barrels of Gold Bell which you confirmed to me. In my correspondence with Mr. Pierson I consented only to an extension of time on delivery of thirty days, which in no sense cancels any part of this contract."

On November 11 Clark again wired the appellee: "Hurry shipment last thousand barrels Gold Bell, Pierson contract." Again he was referred to Mr. Pierson, and at once wired the latter: "Must have shipment thousand Gold Bell, your contract. Rush. Cannot wait any longer." On December 6 he wired the appellee: "Unable to do anything with Pierson, must look to you fulfillment of contract." On the same day the appellee replied, saying: "We have written you several different times that our contract with you is completed, so we have nothing more to ship."

On November 22 the appellant purchased flour of similar quality to protect himself against loss on the thousand barrels, for which he paid the then market price of $8.45 a barrel.

Notwithstanding the somewhat complicated facts, the case is quite simple. Appellant's principal theory is that the appellee, with full knowledge of the facts, sent a confirmation to him on August 23 and two days later began shipping the flour marked "sold to Frank G. Clark"; that this indicated an intention to abide by the transaction as negotiated by Pierson, and that the appellee is bound by the terms of the contract Pierson made with appellant and by all that Pierson subsequently did. In support of this theory stress is laid upon ex-

pressions in a letter from the appellee to the appellant where reference is made to "our contract with you," the statement in the invoices, "sold to Frank G. Clark," the expression in letters to Pierson referring to the flour as "sold to Clark," and "confirming a sale through Pierson," reference in other letters to Pierson, referring to the transaction as "the Frank G. Clark order," and statements in letters to Pierson in which the appellee asked him to supply it with a release signed by Clark in order "that we may be relieved of all liability."

An exhibit, not referred to in the findings, is a letter from Clark to Pierson in August admitting receipt of a confirmation from the appellee and directing Pierson's attention to a previous letter in reference to Chicago inspection, and stating that Chicago buyers would not accept Kansas City inspection and that it was only a needless expense. And yet as late as September 21, in response to appellee's request that he sign and return the duplicate confirmation sent him in August, he writes that he is unable to locate the confirmation. Late in November, when he was having trouble with Pierson over the last thousand barrels, he apparently had succeeded in locating it—for he writes appellee that there was still a thousand barrels of flour due him on a sale "which you confirmed to me."

The fact is he was invited by the appellee to enter into a contract directly with it on certain terms stated in the confirmation sent him, among which terms were "cars to be stopped at Kansas City for inspection, buyer to pay inspection charges." The fact that he not only refused to reply to this and other letters, but had no communication with the appellee whatever until after the trouble arose between him and Pierson (save the one letter of September 21 stating that he was unable to locate the confirmation), indicates a studious attempt to avoid entering into a contract with the appellee which would bind himself. Doubtless the trial court was not impressed with the claims of a business man who refused to answer a business letter as important as the one with reference to the confirmation. Of course, the appellee was in a position where it could elect if it saw fit to regard a contract with appellant as in force on the terms stated in the unanswered confirmation. The legal effect of the acceptance and retention of a written confirmation in contracts of this character when originally made

by oral communication, by telephone, or by telegrams has been passed upon by this court in a number of recent cases. (*Strong v. Ringle,* 96 Kan. 573, 152 Pac. 631; *Wallingford v. Grain Co.,* 100 Kan. 207, 213, 164 Pac. 275; *Cardwell v. Uhl,* 105 Kan. 249, 182 Pac. 415. See, also, 13 C. J. 279.) The same principle applies to the present case because the appellant had no contract whatever with the appellee, unless one arose by the sending of the written confirmation of August 23; and unless the appellant, upon receipt of it, communicated to the appellee any objections he might have to its terms, the contract was embodied in the letter of confirmation itself.

The trial court reached the conclusion that the transaction between Pierson and the appellee was a valid contract of sale of the 5,000 barrels of flour to Pierson upon the terms stated in their correspondence, and that neither party had any intention of making a sale of the same flour to Clark, but afterwards and before any of the flour was shipped, Pierson sold the flour to Clark upon somewhat different terms, including delivery at Chicago, which required payment by the seller of inspection weights there and an advance in price of twelve cents per barrel, terms which were not known or agreed to by the appellee, and that the shipment of the flour direct to Clark, billed as sold to him, upon drafts paid by him, were all in the execution of the contract between Pierson and Clark; that the appellee on Pierson's order offered to confirm the sale direct to Clark, but that Clark never accepted the proposed terms offered, and never agreed to Kansas City inspection nor to pay for Chicago inspection; and further, that he never advised the appellee of his contract with Pierson.

If we accept appellant's theory that Pierson was a broker and never had any interest in the flour, then he was a mere go-between, a middleman. Both appellant and appellee were aware of the fact that Pierson was to receive twelve cents per barrel from appellant, and the latter knew that if he entered into a contract with appellee, the contract was one made "per Pierson" or "through Pierson," and the presumption is that he also knew that Pierson was not acting without expecting to receive some sort of a commission or profit from the appellee. Therefore, the general rule as to representing adverse interests has no application because the broker's employment was such

Clark v. Flour Mills Co.

that his duties were not discretionary in character, and he was employed merely as a middleman "for the sole purpose of bringing certain persons together." (4 R. C. L. 275. And see note, *McLure v. Luke*, 24 L. R. A., n. s., 661.) In that view of the case the appellant simply loaned his fellow broker a thousand barrels of the flour and authorized him to notify the appellee to divert it to another shipment for Pierson's accommodation. If, in the meantime, flour had gone down in price $2 or $3 per barrel, appellant would doubtless have objected strenuously to any attempt by appellee to compel him to accept and pay for another thousand barrels at the original price. The contention that Pierson was appellee's agent with authority to bind the latter is not sustained by the findings nor, in our opinion, by a fair construction of the writings.

The trial court was right in considering the question of little importance whether there was a contract between the appellant and the appellee by which the latter agreed to deliver the full 5,000 barrels of flour, for the reason that appellant saw fit to loan to Pierson the last thousand barrels under a personal arrangement between them, and appellant had no right to assume that Pierson had authority from the appellee to extend the time of delivery of the balance of the flour, and as the court held, "in fact Pierson had no such authority, especially in view of the fact that the market price of flour appears to have been going up, and that the defendant expressly stated to Pierson, September 9, that it would have to get out the Clark order at that time."

To the appellant's insistence that the appellee is estopped to deny that a contract existed between them for the sale and purchase of the full amount of the flour, the answer is that the appellant is the one who is estopped, first, by his refusal to deal with the appellee until he found himself unable to come to a satisfactory adjustment of his differences with Pierson; second, by authorizing the thousand barrels to be delivered on Pierson's order.

The judgment is affirmed.